1    **WO**

2                          NOT FOR PUBLICATION

3

4

5

6            IN THE UNITED STATES DISTRICT COURT

7               FOR THE DISTRICT OF ARIZONA

8

9    Loren L. Howard, a single man,              )    No. CV-09-1042-PHX-GMS
                                                  )
10              Plaintiff,                        )    **ORDER**
                                                  )
11   vs.                                          )
                                                  )
12                                                )
     Certain   Underwriters   at   Lloyd's   of  )
13   London, an alien, unauthorized insurer,      )
                                                  )
14              Defendant.                        )
                                                  )
15   _____         )

16

17          Pending before the Court are the following motions: (1) Plaintiff Loren Howard's

18   Motion for Summary Judgment on Defendant's Counterclaim for Rescission (Doc. 41); (2)

19   Motion for Summary Judgment (Doc. 43) filed by Defendant Certain Underwriters at Lloyd's

20   of London; and (3) Plaintiff's Motion to Strike (Doc. 45). For the reasons stated below, the

21   Court grants in part and denies in part Plaintiff's Motion to Strike, denies Plaintiff's Motion

22   for Summary Judgment, and denies Defendant's Motion for Summary Judgment.

23                              **BACKGROUND**

24          In January 2005, Plaintiff Loren Howard, a football player at Northwestern

25   University, applied for disability insurance after being approached by an insurance broker,

26   James Padilla, who told Plaintiff that he qualified for the insurance. (Doc. 42; 44, Ex. 1; 50).

27   On January 7, 2005, Plaintiff submitted the application for disability insurance to Defendant.

28   (Doc. 41). The insurance application contained the following question: Have you ever injured

1   or suffered pain or discomfort, or had surgery to . . . [your] Right Knee? (Doc. 42, Ex. 2).

2   Plaintiff answered "no." (*Id.*). Plaintiff did disclose that he had missed the first six games of

3   the season after having surgery on his right ankle in January 2004 and his left ankle in

4   September 2004 to treat peroneal ligament subluxation. (Doc. 44, Ex. 1). He also noted on

5   his application that he had experienced muscle spasms of his lower back in March 2004 and

6   a left PIP dislocation (left hand) in April 2004. Defendant approved the application,

7   excluding  coverage of Plaintiff's ankles, and issued a policy, providing $500,000 of

8   coverage, with effective dates of December 17, 2004 through August 1, 2006. (Doc. 42; Doc.

9   44, Ex. 1). Subsequently, Padilla approached Plaintiff again, offering to increase Plaintiff's

10   coverage by another $500,000. (Doc. 42; 44, Ex. 2). To receive the increase in coverage,

11   Plaintiff was required to submit a Letter of Health, which he dated February 27, 2005,

12   indicating that there had been no change in his health since he submitted his original

13   application in January 2005. (Doc. 42, Ex. 6). On March 7, 2005, Plaintiff received a letter,

14   stating that his coverage had been increased to $1 million, effective February 10, 2005. (Doc.

15   42, Ex. 4).

16       In May 2005, based on the recommendation of an orthopedist at Northwestern

17   University, Plaintiff underwent arthroscopic surgery to address "chronic quadriceps

18   tendinitis" and chondromalacia patella of his right knee. (Doc. 42, Ex. 17). Plaintiff contends

19   that, by August 2005, he began experiencing pain in his right knee again, and as a result,

20   underwent another surgery later that month. (Doc. 42, Ex. 18). Unable to fully recover

21   following several knee surgeries, Plaintiff contacted Padilla regarding a claim for disability.

22   (Doc. 42, Ex. 22, 23). In August 2007, Padilla submitted Plaintiff's claim, which appears to

23   assert that as a result of an accident – the May 2005 surgery – he was totally disabled and

24   suffering from right knee tendinitis, level 3 chondromalacia, and other complications

25   following surgery. (Doc. 42, Ex. 24; 44, Ex. 2). The relevant provision of his insurance

26   policy states:

27       In the event that the **Insured** sustains **Bodily Injury** caused in and of itself by
        an **Accident** occurring during the Certificate period and which, solely and

28       independently of any other cause, results in the **Total Disablement** directly

1
2
culminating in the **Permanent Total Disablement** of the **Insured**, and providing the **Total Disablement** commenced within six (6) months of the date of such **Accident**, then the Insurer agrees to pay benefits stated in the Schedule to the Insured.

3

(Doc. 42, Ex. 3).

4
5
As of April 2009, Defendant had not issued a final decision regarding Plaintiff's claim. Accordingly, Plaintiff filed his Complaint. (Doc. 2, Ex. 1).

6
7
### DISCUSSION

### I.    Motion to Strike

8
9
10
11
12
13
14
15
16
17
18
19
20
Plaintiff filed a motion to strike underwriter Colin Fairlie's July 23, 2010 affidavit pursuant to Rule 37(c) of the Federal Rules of Civil Procedure for Defendant's failure to disclose the subject of any discoverable information that Fairlie could offer to support Defendant's claims as required by Rules 26(a) and 26(e) of the Federal Rules of Civil Procedure. (Doc. 45).[1] Specifically, Plaintiff contends that Defendant never indicated that Fairlie would provide evidence regarding Defendant's decision to rescind Plaintiff's policy or supporting the rescission claim. Plaintiff requests that the Court exclude Fairlie's testimony in its entirety, award fees and costs to Plaintiff in connection with filing his Motion to Strike, and inform the jury of Defendant's failure to disclose the testimony at trial. Upon review of the affidavit in question, the Court issued an order requesting that each party submit a supplemental memorandum addressing the issue of whether Defendant was required to disclose Fairlie as an expert under Federal Rule of Evidence 702 because the subject of Fairlie's affidavit was derived from "specialized knowledge." (Doc. 59).

21
22
23
24
Defendant contends that Fairlie's affidavit and testimony should not be excluded because he is serving as a fact witness, not an expert witness. (Doc. 60). Defendant argues that Fairlie is "providing evidence as a party about facts and circumstances within his

25
26
27
28

---

[1] In his Reply, Plaintiff additionally requests that the Court strike Keith Scoffield's affidavit and preclude him from testifying at trial. (Doc. 58). The Court need not consider arguments raised for the first time in a reply brief. *Bazuaye v. I.N.S.*, 79 F.3d 118, 120 (9th Cir. 1996) ("Issues raised for the first time in the reply brief are waived.").

1   personal knowledge and about decisions he made regarding the issues in this litigation." (*Id.*).

2   If the Court interprets Fairlie as providing an opinion, Defendant asserts that the opinion

3   would be within the scope of Federal Rule of Evidence 701.

4       To the extent that Fairlie's initial affidavit describes the process and any

5   determinations actually made with regard to the issuance of Plaintiff's policy and the

6   exclusion of Plaintiff's ankles, specifically paragraphs 1-7, that portion of the affidavit will

7   not be stricken. (Doc. 44, Ex. 9). However, in paragraphs 8 and 9, Fairlie describes a

8   hypothetical situation, in which Plaintiff submits medical information about his right knee,

9   and explains the steps he would have taken and determinations he would have made had that

10  actually occurred. Defendant incorrectly describes these circumstances as fact. (Doc. 60).

11  The circumstances described cannot be considered facts, by definition, because they did not

12  actually take place. Without any underwriting guidelines or other similar materials,

13  Defendant appears to be relying on Fairlie's opinion as an expert who has specialized

14  knowledge of underwriting standards to establish William J. Sutton & Co.'s standards for

15  making determinations about insuring athletes with particular types of injuries.

16      Defendant attempts to describe any opinion expressed as "lay witness" opinion,

17  subject to Federal Rule of Evidence 701. Rule 701 explains that lay testimony is limited to

18  opinions or inferences which are "rationally based on the *perception* of the witness" and "not

19  based on scientific, technical, or other specialized knowledge." (emphasis added). The

20  Advisory Committee's Note to the 2000 Amendments further explains that the amendment

21  incorporates the following distinctions: "lay testimony 'results from a process of reasoning

22  familiar in everyday life,' while expert testimony 'results from a process of reasoning which

23  can be mastered only by specialists in the field.'" FED. R. EVID. 701 advisory committee's

24  note (quoting *Tennessee v. Brown*, 836 S.W.2d 530, 549 (Tenn. 1992)). It is clear from the

25  language of paragraphs 8 and 9 of the affidavit that Fairlie is not providing testimony

26  "'common enough'" to require only a "limited amount of expertise." *United States v.*

27  *Figueroa-Lopez*, 125 F.3d 1241, 1245–46 (9th Cir. 1997) (quoting *United States v.*

28  *VonWillie*, 59 F.3d 922, 929 (9th Cir. 1995)). Rather, paragraph 8 states: "Based upon my

- 4 -

25 years in the sports insurance industry, I know that tendonitis can be a chronic condition that does not develop overnight, but can be a condition that builds up over time." Fairlie then goes on to describe, based on his extensive experience, what he would have required from Plaintiff and how he would have interpreted certain medical information to come to an ultimate conclusion about Plaintiff's policy. (Doc. 44, Ex. 9).

Setting aside the issue of whether Fairlie is qualified by "knowledge, skill, experience, training, or education" to testify regarding Plaintiff's knee condition and generally about a diagnosis of tendinitis, *see* FED. R. EVID. 702, Fairlie's affidavit provides an opinion about a hypothetical situation based on Fairlie's assertion of specialized knowledge in underwriting standards. *Cf. Cedar Hill Hardware & Constr. Supply, Inc. v. Ins. Corp. of Hannover*, 563 F.3d 329, 343 (8th Cir. 2009) (witness testifying about underwriting standards and decisions was qualified as an expert due to his "specialized knowledge"); *Am. Gen. Life Ins. Co. v. Schoenthal*, 555 F.3d 1331, 1338–39 (11th Cir. 2009) (witness testifying about financial underwriting standards and risk management issues qualified as an expert based on his education and experience); *Hangarter v. Provident Life & Accident Ins. Co.*, 373 F.3d 998, 1015–16 (9th Cir. 2004) (concluding that a witness testifying about claims adjustment standards who has "twenty-five years' experience working for insurance companies" and has evaluated claims and insurance policies was correctly considered an expert witness). Therefore, Defendant was required to disclose Fairlie's testimony to the extent that it constitutes expert testimony. *Cf. Hangarter*, 373 F.3d at 1015 (explaining that "the advisory committee notes emphasize that Rule 702 is broadly phrased and intended to embrace more than a narrow definition of qualified expert" (internal quotation marks omitted)).

The Ninth Circuit has explained:

> In these days of heavy caseloads, trial courts in both the federal and state systems routinely set schedules and establish deadlines to foster the efficient treatment and resolution of cases. Those efforts will be successful only if the deadlines are taken seriously by the parties, and the best way to encourage that is to enforce the deadlines. Parties must understand that they will pay a price for failure to comply strictly with scheduling and other orders, and that failure to do so may properly support severe sanctions and exclusions of evidence.

*Wong v. Regents of the Univ. of Cal.*, 410 F.3d 1052, 1060 (9th Cir. 2005). Of course, such

rules should not be "enforced mindlessly." *Id.* Here, the Court's Amended Case Management Order made clear that Defendant was required to provide "full and complete expert disclosures" no later than February 26, 2010, and failure to comply with the Court's Order, "absent truly extraordinary circumstances," would result in the exclusion of undisclosed testimony. (Doc. 21). Defendant's memorandum does not suggest that "extraordinary circumstances" prevented Defendant from disclosing Fairlie as an expert witness. Defendant simply did not consider him to be such a witness. Although Defendant listed Fairlie as one of its potential witnesses, Defendant did not disclose the subject matter of any testimony Fairlie would provide. From the documents disclosed to Plaintiff, it would have been clear that Fairlie would potentially testify as to the actual determinations he made with regard to Plaintiff's policy and the exclusion of Plaintiff's ankles. However, it would not have been clear that Defendant intended to use Fairlie's testimony as a substitute for underwriting guidelines that Defendant apparently does not maintain. (Doc. 54). Moreover, Defendant did not disclose the information documented in Fairlie's affidavit until it filed the affidavit with its Motion for Summary Judgment after the close of discovery. In any event, the burden is on Defendant to meet the exception to the Court's Order, and it has not done so. Accordingly, paragraphs 8 and 9 are stricken from the initial Fairlie affidavit. (Doc. 44, Ex. 9). Additionally, paragraph 4 of Fairlie's supplemental affidavit, which was filed after Plaintiff filed his Motion to Strike, shall be stricken for the same reason. (Doc. 50, Ex.2). The Court does not consider sanctions appropriate in this case.

## II.    Motions for Summary Judgment

### A.    Legal Standard

Summary judgment is appropriate if the evidence, viewed in the light most favorable to the nonmoving party, demonstrates "that there is no genuine issue as to any material fact and that the movant is entitled to judgment as a matter of law." FED. R. CIV. P. 56(c)(2). Substantive law determines which facts are material and "[o]nly disputes over facts that might affect the outcome of the suit under the governing law will properly preclude the entry of summary judgment." *Anderson v. Liberty Lobby, Inc.,* 477 U.S. 242, 248 (1986). "A fact

issue is genuine 'if the evidence is such that a reasonable jury could return a verdict for the nonmoving party.'" *Villiarimo v. Aloha Island Air, Inc.*, 281 F.3d 1054, 1061 (9th Cir. 2002) (quoting *Anderson,* 477 U.S. at 248). Thus, the nonmoving party must show that the genuine factual issues "'can be resolved only by a finder of fact *because they may reasonably be resolved in favor of either party*.'" *Cal. Architectural Bldg. Prods., Inc. v. Franciscan Ceramics, Inc.*, 818 F.2d 1466, 1468 (9th Cir. 1987)  (quoting *Anderson*,  477 U.S. at 250).

### B.    Rescission

Before the Court are cross motions for summary judgment on the issue of rescission. (Doc. 41, 43). Plaintiff asserts that Defendant has failed to meet its burden of establishing that Plaintiff's omissions on the application form or the assertions on the Letter of Health were "fraudulent." (Doc. 41). Plaintiff argues that nothing in the record establishes the materiality of his medical history as to his knee or indicates that Defendant would not have issued a policy covering the right knee had Plaintiff's medical history been disclosed. Defendant counters that Plaintiff's failure to disclose his knee problems constituted material misrepresentations, of which had Defendant been aware, it would not have covered Plaintiff's right knee or increased the policy limits to $1 million. (Doc. 43).

Under A.R.S. § 20-1109, misrepresentations, omissions, concealment of facts and incorrect statements shall not prevent recovery under the policy unless:

1.    Fraudulent.

2.    Material either to the acceptance of the risk, or to the hazard assumed by the insurer.

3.    The insurer in good faith would either not have issued the policy, or would not have issued a policy in as large an amount, or would not have provided coverage with respect to the hazard resulting in the loss, if the true facts had been made known to the insurer as required by the application for the policy or otherwise.

Rescission of an insurance policy is permitted "only if all three subparagraphs of § 20-1109 are satisfied." *Greves v. Ohio State Life Ins. Co.*, 170 Ariz. 66, 72, 821 P.2d 757, 763 (App. 1991); *see also Smith v. Republic Nat'l Life Ins. Co.*, 107 Ariz. 112, 115, 483 P.2d 527, 530

(1971) (concluding that "in order for recovery to be prevented under a policy", the elements of all three subparagraphs must be met); *Valley Farms, Ltd. v. Transcon. Ins. Co.*, 206 Ariz. 349, 353, 78 P.3d 1070, 1074 (App. 2003) ("An insurer may not deny coverage under a policy unless the insurer can prove that all three conditions of § 20-1109 have been satisfied.").

### 1.      Fraudulent

In Plaintiff's Motion for Summary Judgment, he states that following the 2004 football season, he sought treatment with Dr. Moussa for "right knee pain." (Doc. 41). "Specifically, on January 6, 2005, [he] was *experiencing pain and tenderness* over the quadriceps tendon, his *right knee hurt* when doing squats, and it hurt when bent for prolonged periods of time." (Doc. 41 (emphasis added); 46). During that visit, the doctor ordered an MRI of Plaintiff's right knee. (Doc. 42, Ex. 9). Dr. Moussa's report from that day states that Plaintiff complained of "right knee pain", and concluded that Plaintiff was suffering from "[r]ight knee quadriceps tendinitis, patellofemoral pain." (*Id.*). Plaintiff further states "[n]otably, Dr. Moussa testified that his diagnosis of Plaintiff on January 6, 2005, was 'probably the most common knee pain diagnosis there is in any orthopedic practice.'" (Doc. 41). A few days later, Plaintiff underwent the MRI, which, he admits, "revealed a 'very small, localized partial tear or strain pattern' involving the distal quadriceps tendon over 10 to 12 millimeters." (Doc. 41; *see also* Doc. 47, Ex.10 (noting that Plaintiff's clinical history includes "Knee pain")). On January 14, 2005, Plaintiff was instructed to go to physical therapy 2-3 times per week for 4-6 weeks based on a diagnosis of right quad tendinitis. (Doc. 44, Ex. 2, 1139). Dr. Moussa ordered the physical therapy after Plaintiff submitted his original insurance application, but before submitting the Letter of Health in February 2005. (Doc. 44, Ex. 2).

The fraud requirement of A.R.S. § 20-1109(1) may be satisfied by a showing of either legal or actual fraud. *James River Ins. Co. v. Hebert Schenk, P.C.*, 523 F.3d 915, 921 (9th Cir. 2008). If the insurance application question elicits a factual response, Defendant need only demonstrate legal fraud. *See Mann v. N.Y. Life Ins. & Annuity Corp.*, 222 F. Supp.2d

1151, 1154 (D. Ariz. 2002). However, if the response is "merely an expression of opinion", the insurer must prove actual fraud to rescind a policy under the statute. *Med. Protective Co. v. Pang*, 606 F. Supp.2d 1049, 1057 (D. Ariz. 2008).

### a.    Insurance Application

The question at issue asks if Plaintiff had ever "injured or suffered pain or discomfort, or had surgery to" his right knee. Plaintiff appears to argue that because he believed his knee problems were not "significant", he properly responded to the insurance application question in the negative. (Doc. 42, Ex. 1, 13). Plaintiff does not specifically assert that this question was ambiguous or that the question elicited an opinion, rather than a factual answer. *See Stewart v. Mut. of Omaha Ins. Co.*, 169 Ariz. 99, 103, 817 P.2d 44, 48 (App. 1991) ("Where the response is merely an expression of opinion, the insurer must prove actual fraud to rescind a policy under the statute."). He simply states that "Defendant has failed to offer any evidence that the omissions on the application form or the assertions on the Letter of Health were fraudulent." (Doc. 41).

"Whether a question calls for a factual response or an opinion depends on the evidence in the case and is a question of fact for the jury, unless reasonable persons could not differ regarding whether the answer was a statement of opinion or fact." *Med. Protective*, 606 F. Supp.2d at 1057 (citing *Equitable Life Assurance Soc'y of the U.S. v. Anderson*, 151 Ariz. 355, 359, 727 P.2d 1066, 1070 (App. 1986)). The insurance application question asks if Plaintiff had ever "injured or suffered pain or discomfort, or had surgery to" his right knee. The question contains no qualifiers, such as "significant" pain or discomfort, which would call for a subjective determination on the part of the applicant. *Cf. James River Ins.*, 523 F.3d at 922 (explaining that a question that requires the insured to "exercise judgment in applying that standard to the facts" may be viewed as a question eliciting an opinion). Even if the question on the insurance application could be interpreted as requiring an applicant to exercise judgment in determining whether he had experienced such pain, the evidence in this case demonstrates that the question elicited a factual response. *See Equitable Life*, 151 Ariz. at 357–58, 727 P.2d at 1068–69 (determining that, based on an admission that the insured

had "withdrawn from heroin" within the relevant period, a question asking if the insured was a "habitual" user of drugs elicited a factual response). Plaintiff has already admitted in his Motion for Summary Judgment that the day before he submitted the application, he "experienced pain and tenderness" in the area of his right knee, and specifically that his "right knee hurt" when doing certain activities, and that as a result, he visited a doctor. Given this admission, no reasonable jury could conclude that the question of whether Plaintiff had ever suffered pain or discomfort in his right knee requested a statement of opinion.

"If a question on an insurance application seeks facts which are presumably within the personal knowledge of the insured and are such that the insurer would naturally have contemplated that the answer represented the actual facts and the answer is false, the insured has committed legal fraud." *Stewart*, 169 Ariz. at 102–03, 817 P.2d at 47–48. No reasonable jury could conclude that facts regarding Plaintiff's personal experience of pain or discomfort are not within Plaintiff's personal knowledge. Because the question elicited facts arising out of Plaintiff's personal experience, Defendant would have assumed that Plaintiff's answer represented the actual facts. Finally, Plaintiff has admitted that just the day before he signed his application, he was experiencing pain in his right knee sufficient to warrant a visit to the doctor. And yet, Plaintiff stated in his application that he had not experienced pain or discomfort to his right knee. Thus, his answer was false, establishing legal fraud. The fact that Plaintiff believed he was correctly answering the question is immaterial. *See Equitable Life*, 151 Ariz. at 359, 727 P.2d at 1070.

### b.   Letter of Health

In February 2005, Plaintiff was required to submit a Letter of Health to increase his policy limits from $500,000 to $1 million. The Letter of Health states the following:

> I, Loren L. Howard, am currently in good health and there has been no change in the state of my health since January 7, '05 (the date I complete my last sports application). I have not missed any games, tournaments or practices due to illness or injury.
>
> **OR**
>
> I have consulted the following doctor(s) or trainer(s) for the illness(es)/injury(ies) listed below.

(Doc. 42, Ex. 6). Plaintiff wrote "N/A" in the chart where he was supposed to list any

1   illnesses or injuries and signed the letter at the bottom. Plaintiff contends that his assertions

2   were not fraudulent. (Doc. 48). Defendant argues that Plaintiff's "failure to disclose the

3   physical therapy treatments and visits to Dr. Galea in Canada" constituted fraud. (Doc. 43).

4          Because reasonable persons could disagree regarding whether Plaintiff's assertions

5   were fraudulent, this is an issue that should be resolved by the fact finder. Defendant has not

6   presented any evidence that demonstrates to the Court that, as a matter of law, Plaintiff knew

7   that his knee condition constituted an "illness" or "injury." Defendant emphasizes Plaintiff's

8   physical therapy sessions and consultation with Dr. Galea in Canada. (Doc. 43). However,

9   Dr. Galea actually told Plaintiff that his ultrasound showed no evidence of a tear in his right

10  knee, and instead, revealed a fat pad impingement and inflammation. (Doc. 46; 47, Ex. 15).

11  The Letter of Health appears to only request information about consultations related to an

12  "illness" or "injury." And even the statement about being in good health at the top of the

13  Letter of Health, when read in its entirety, refers to "illness or injury." Under Arizona law,

14  ambiguity in insurance applications is generally construed in favor of the insured. *James*

15  *River Ins.*, 523 F.3d at 922. Whether Plaintiff could have reasonably believed that his

16  condition fell outside the terms "illness" and "injury" is appropriately viewed as an issue of

17  fact. *Cf. Stewart*, 169 Ariz. at 103–05, 817 P.2d at 48–50 (plaintiff's responses were not

18  fraudulent where the insurer failed to present evidence that plaintiff was told he had a mental

19  disorder and plaintiff's understanding of the terms "mental disorder" and "ill health" may

20  reasonably have differed from the insurer's understanding of those terms). Accordingly,

21  summary judgment on the issue of fraud is denied as to Plaintiff's assertions on the Letter

22  of Health.

23              **2.      Materiality**

24          Defendant argues the specificity of the questions in the insurance application shows

25  that the information requested was considered material to the insurer. (Doc. 43).

26  Additionally, in its Response to Plaintiff's Motion, Defendant argues that its treatment of

27  Plaintiff's ankle condition demonstrates that it would have at least been "cautious regarding

28  potentially disabling conditions", which demonstrates materiality. (Doc. 49). Plaintiff, on the

other hand, contends that the record contains no evidence of underwriting guidelines or other evidence from Defendant's underwriters establishing that the information omitted would have been material to Defendant's decision to issue the policy. (Doc. 41).[2]

The test of materiality of a misrepresentation in an insurance policy application is whether "the facts, if truly stated, might have influenced a reasonable insurer in deciding whether to accept or reject the risk." *Med. Protective*, 606 F. Supp.2d at 1058 (citing *Cent. Nat'l Life Ins. Co. v. Peterson*, 23 Ariz.App. 4, 7, 529 P.2d 1213, 1216 (1975)). Plaintiff has not presented any evidence that would suggest that answering "yes" on the insurance application would not have at least influenced Defendant in making a determination about Plaintiff's application. On the other hand, Defendant's treatment of Plaintiff's other physical conditions, at a minimum, raises a genuine issue of material fact as to the materiality of the undisclosed knee condition because it suggests that Defendant would have considered the nature of the specific complaints before deciding both whether to issue a policy and the amount of any policy issued.

### 3. Issuance of the Policy

Defendant contends that it has met its burden of demonstrating that, had it been aware of Plaintiff's right knee condition, it would have excluded coverage of Plaintiff's knees and denied a request for an increase in coverage. In the alternative, Defendant contends that the increase in coverage from $500,000 to $1 million should be rescinded. (Doc. 43). First, Defendant points to the fact that coverage under the insurance policy was subject to receipt of Plaintiff's medical information. (Doc. 44, Ex. 2). Second, once Defendant reviewed Plaintiff's medical records and discovered that Plaintiff had surgery on both ankles in 2004, Defendant excluded both ankles from coverage. (Doc. 43; 44, Ex. 1). Finally, Defendant relies on an affidavit of underwriter, Colin Fairlie, parts of which have been stricken as

---

[2] Defendant has explained that there are no written underwriting guidelines. Instead, "[e]ach case is evaluated on its facts based upon the underwriter's experience in the industry and knowledge of the client." (Doc. 49; 50, Ex. 2).

1   discussed above.[3]

2      Defendant bears the burden of showing that any changes that would have been made

3   to Plaintiff's policy upon discovery of his knee condition are among the changes listed in

4   A.R.S. § 20-1109(3). *Greves*, 170 Ariz. at 73, 821 P.2d at 764. "The statute does not permit

5   rescission if the insurer merely would have charged a higher premium for the coverage for

6   which the insured applied." *Id.* Whether Defendant would have refused to issue a policy or

7   would have issued a policy different from the one actually issued is a question of fact. *State*

8   *Comp. Fund v. Mar Pac Helicopter Corp.*, 156 Ariz. 348, 353, 752 P.2d 1, 6 (App. 1987).

9      In the absence of underwriting guidelines or some other similar evidence showing that

10  Defendant would have excluded coverage of Plaintiff's right knee or would not have issued

11  a policy in as large an amount, Defendant's evidence does not establish as a matter of law

12  that A.R.S. § 20-1109(3) has been met. *Cf. Mann*, 222 F. Supp.2d at 1155–56 (concluding

13  that underwriting guidelines which listed cocaine use as a "risk not acceptable" conclusively

14  showed that the insurer would not have issued the policy had plaintiff responded truthfully

15  about his past drug use on the application). Regarding Defendant's first point, the fact that

16  the insurance company reserved the right to amend the terms and conditions of the coverage

17  upon receipt of supporting documentation of Plaintiff's medical history does not necessarily

18  confirm that had the insurance company received information regarding Plaintiff's knee

19  condition at that time, it would have amended the terms of Plaintiff's coverage. The

20  description of conditions that would not be covered prior to Defendant's review of Plaintiff's

21  _____

22      [3] With regard to this element, Defendant contends in its Response that "documents
    from Defendant's files also show that Colin Fairlie refused to consider the renewal of
23  Plaintiff's policy until he had played at least a few football games to show that the knee was
    not a continuing problem." (Doc. 49). Defendant directs the Court to DSOF 1, which refers
24  to a denial of a renewal of the insurance policy due to Plaintiff's ankle condition. (Doc. 50).
    Thus, the Court assumes that Defendant intended to refer to this condition, rather than his
25  knee condition, in Document 49. In any event, the underwriter's conclusions in mid-2006,
    following a year in which Plaintiff was unable to play in any games, do not support the
26  assertion that the underwriter would have come to the same conclusion regarding Plaintiff's
    knee condition with the information that could have been made available to Defendant in
27  early 2005.

28

medical documentation does not establish, as a matter of law, that Defendant would have excluded Plaintiff's right knee or denied additional coverage. In fact, Defendant has suggested in several documents submitted to the Court, including the Counterclaim and Response to Plaintiff's Motion to Strike, *see* Doc. 11 & 54, that had it received documentation regarding Plaintiff's knee, a possible result would have been to increase his premiums, which under Arizona law does not meet the standard for establishing § 20-1109(3). *See Greves*, 170 Ariz. at 73, 821 P.2d at 764.

In the application, Plaintiff alerted Defendant to his ankle condition and also noted that he had experienced muscle spasms of his lower back in March 2004 and a left PIP dislocation (left hand) in April 2004. (Doc. 44, Ex. 1). Evidence in the record shows that, after reviewing this information, the underwriter determined that the ankles should be excluded from coverage, but made no reference to the other conditions/injuries. This evidence raises a genuine issue of material fact for the fact-finder because it demonstrates that Defendant viewed only certain conditions as sufficiently serious to warrant exclusion from coverage. The trier of fact should determine whether Plaintiff's knee condition at the time he submitted his application and Letter of Health is more comparable to his ankle condition or the other conditions. Accordingly, summary judgment is not appropriate as to the issue of rescission.

**C.    Bad Faith**

Plaintiff's Complaint raises only one claim–that Defendant has acted in bad faith by failing to timely process Plaintiff's claim for disability benefits, which has been pending since June 2007. (Doc. 2, Ex. 1).[4] Plaintiff argues that, although he has complied with every request made by Defendant for additional documentation and examination, Defendant has continued to employ pretext to unreasonably delay the decision to pay or deny benefits, amounting to a breach of the implied covenant of good faith and fair dealing and thus,

---

[4] Plaintiff appears to be using the date on which he signed the Incident Report Form as the date he submitted his claim, although it appears that his insurance agent, Padilla, did not send the form and supporting documents to Defendant until August 1, 2007.

1  committing bad faith. Defendant moves for summary judgment, arguing that its extensive
2  investigation of Plaintiff's claim was reasonable due to the omissions and misrepresentations
3  on Plaintiff's insurance application and subsequent Letter of Health. (Doc. 43).

4        An insurer "may commit bad faith not only by intentionally and unreasonably denying
5  a claim, but also by intentionally processing, evaluating, or paying a claim in an unreasonable
6  manner." *James River*, 523 F.3d at 923 (citing *Zilisch v. State Farm Mut. Auto. Ins. Co.*, 196
7  Ariz. 234, 237, 995 P.2d 276, 279 (2000)); *see also Trus Joist Corp. v. Safeco Ins. Co. of
8  Am.*, 153 Ariz. 95, 103, 735 P.2d 125, 133 (App.1986). To establish bad faith, Plaintiff must
9  show that the insurer (1) "acted unreasonably toward its insured" and (2) "acted *knowing* that
10 it was acting unreasonably *or* acted with such reckless disregard that such knowledge may
11 be imputed to it." *Trus Joist*, 153 Ariz. at 104, 735 P.2d 125, 134.

12       Defendant asserts that neither of these prongs have been met. Specifically, Defendant
13 contends that its actions were reasonable because Plaintiff's Incident Report Form raised
14 questions regarding the accuracy of the statements he made on his insurance application and
15 subsequent Letter of Health supporting his request for an increase in coverage. (Doc. 43).
16 According to Defendant, investigating Plaintiff's claims and obtaining the relevant medical
17 records was "a time-consuming and iterative process." (*Id.*). Defendant also claims that
18 Plaintiff's repeated misrepresentations about his medical history and treatment for tendinitis
19 delayed the investigative process significantly. In sum, Defendant asserts that because the
20 claim was fairly debatable, it cannot be liable for bad faith by thoroughly investigating the
21 claim. (*Id.* (citing *Knoell v. Metro. Life Ins. Co.*, 163 F. Supp.2d 1072, 1075 (D. Ariz. 2001)
22 ("[W]hen there is a question of fact as to liability on  the underlying policy, then as a matter
23 of law, the insurance company is not liable for bad faith.")).

24                          **1.      Fair Debatability of the Claim**

25       The Arizona Supreme Court has made clear that fair debatability is a "necessary
26 condition to avoid a claim of bad faith," but "it is not always a sufficient condition." *Zilisch*,
27 196 Ariz. at 238, 995 P.2d at 280. "While an insurer may challenge claims which are fairly
28 debatable, its belief in fair debatability 'is a question of fact to be determined by the jury.'"

*Id.* at 237, 995 P.2d at 279 (internal citation omitted) (quoting *Sparks v. Republic Nat'l Life Ins. Co.*, 132 Ariz. 529, 539, 647 P.2d 1127, 1137 (1982)). However, "[i]f the plaintiff offers no significantly probative evidence that calls into question the defendant's belief in fair debatability . . . the court may rule on the issue as a matter of law." *Young v. Allstate Ins. Co.*, 296 F.Supp.2d 1111, 1116 (D. Ariz. 2003); *see also Lopez v. Allstate Ins. Co.*, 282 F.Supp.2d 1095, 1100 (D. Ariz. 2003). Here, Plaintiff has not offered any evidence that raises a genuine issue as to Defendant's belief in the fair debatability of Plaintiff's claim. *See Young*, 296 F.Supp.2d at 1116 (citing *Knoell*, 163 F.Supp.2d at 1077 ("[B]ecause there are no questions of fact to present to a jury about whether the insurance company really believed it should investigate the claim verses [sic] just using the investigation as a pretext to avoid payment, this Court concludes that the Defendant did not act in bad faith by investigating the claim."))[5]

In 2007, Plaintiff submitted an Incident Report Form and some medical documentation in connection with his claim, in which he asserted that Defendant should pay disability benefits based on an "accident" to his right knee. (Doc. 47, Ex. 25, 26). Under the policy, an accident is "a single sudden and unexpected event, which" (1) occurs at an identifiable time and place; (2) causes unexpected bodily injury at the time it occurs; and (3) arises from an external source to the insured. (Doc. 44, Ex. 1 DEFT 0007; 46). Plaintiff indicated that "he had suffered an accident as a result of right knee tendonitis, level 3 chondromalacia, and that his right knee pain started after surgery on May 5, 2005." (Doc. 46). After reviewing the documents submitted by Plaintiff, Margaret Oesch, the claims examiner had several immediate concerns. (Doc. 44, Ex. 2, DEFT 0178). The medical records, some of which referred to the January 2005 MRI, indicated that Plaintiff may have

---

[5] Plaintiff relies on Mary Fuller's expert report. The report fails to raise an issue of material fact as to Defendant's initial belief of the fair debatability of Plaintiff's claim because it is clear from her report that Ms. Fuller is unaware of a number of material facts in this case. For instance, Ms. Fuller does not appear to know that Dr. LaPrada, who conducted Plaintiff's physical exam for insurance purposes, was not Plaintiff's regular physician, and in fact, is a family member. (Doc. 47, Ex. 11).

1    been suffering from tendinitis in his right knee for years, pre-dating the issuance of his

2    policy. (Doc. 43). Plaintiff had not disclosed this condition on his insurance application, and

3    therefore, this information raised a red flag in terms of the possibility of rescission.

4    Additionally, Plaintiff's description of his injury did not appear to fit within the policy

5    definition of "accident." (Doc. 43; 44, Ex. 2). Defendant alerted Plaintiff of these concerns

6    in a reservation of rights letter dated November 13, 2007 and proceeded to investigate the

7    claim. (Doc. 44. Ex. 2 DEFT 2442). Based on the documentation provided by Plaintiff to

8    Defendant, which raised concerns that Plaintiff had made misrepresentations on his insurance

9    application, the Court concludes that Defendant had a reasonable basis for further

10   investigating Plaintiff's claim.

11       Because the validity of Plaintiff's claim was fairly debatable, Defendant cannot be

12   liable for bad faith for not paying the claim immediately. *See Knoell*, 163 F.Supp.2d at 1075;

13   *see also Sciranko v. Fid. & Guar. Life Ins. Co.* 503 F.Supp.2d 1293, 1321 (D. Ariz. 2007)

14   ("Liability will not attach if the insured's claim is 'fairly debatable' from an objective

15   standpoint and is subjectively perceived as such by the insurer."); *Desert Mountain Props.*

16   *Ltd. P'ship v. Liberty Mut. Fire Ins. Co.*, 225 Ariz. 194, __ , 236 P.3d 421, 442 (App. 2010)

17   ("An insurer's failure to pay a claim is not unreasonable when the claim's validity is 'fairly

18   debatable.'" (citing *Rawlings v. Apodaca*, 151 Ariz. 149, 156, 726 P.2d 565, 572 (1986))).

19                **2.    Claim Investigation**

20       "[E]ven if as a result of a claim being fairly debatable Defendant is not liable for bad

21   faith for failing to pay the claim immediately, Defendant might still be liable for bad faith if

22   Defendant was unreasonable in processing the claim after the initial refusal to pay." *Milhone*

23   *v. Allstate Ins. Co.*, 289 F.Supp.2d 1089, 1094 (D. Ariz. 2003) (citing *Zilisch*, 196 Ariz. at

24   238, 995 P.2d at 280); *see also Clark v. Country Cas. Ins. Co.*, 2009 WL 6476781 *4 (D.

25   Ariz. Oct. 16, 2009) ("An insurer can be held liable for bad faith if it acts unreasonably in

26   processing a claim. An insurer must immediately conduct an adequate investigation and act

27   reasonably in evaluating the claim." (internal citations omitted)). Here, the main issue is not

28   whether Defendant was reasonable in initially investigating the claim, but rather whether it

1   took an unreasonable amount of time to evaluate a claim that Defendant appears to have
2   considered suspect within three days of receiving Plaintiff's Incident Report Form. Courts
3   have rejected bad faith claims based on unreasonable delay when the insurer provided an
4   initial offer or determination within a month or two after the claim was filed. *See, e.g.,*
5   *Milhone*, 289 F.Supp.2d at 1097. However, summary judgment may not be appropriate where
6   an insurer takes approximately a year to evaluate a claim, which has been considered by
7   several courts to be "an unreasonable length of time" to evaluate a claim. *See Bjornstad v.*
8   *Senior Am. Life Ins. Co.*, 599 F.Supp.2d 1165, 1174 (D. Ariz. 2009); *Zilisch*, 196 Ariz. at
9   238, 995 P.2d at 280.

10          Here, approximately 20 months passed between the time Plaintiff filed his claim and
11   when he filed this suit. During this time, Defendant did not make any offers to settle
12   Plaintiff's claim or inform Plaintiff that it would be denying his claim. Defendant argues that
13   what ended up being approximately a 22-month investigation was due to Plaintiff's
14   misrepresentations. However, there is sufficient evidence in the record, offered by Plaintiff
15   as well as Defendant, raising a genuine issue of material fact as to the reasonableness of the
16   duration of this investigation, especially given that Defendant's suspicions were raised just
17   days after Plaintiff filed his claim.

18          On August 1, 2007, Padilla submitted a letter to Oesch, notifying her that Plaintiff was
19   making a "formal disability claim under" his policy and enclosing Plaintiff's Incident Report
20   Form, signed on June 11, 2007, and medical records. (Doc. 47, Ex. 26). It took Defendant
21   approximately six weeks to determine that it did not have a copy of the Incident Report
22   Form, which in viewing the facts in light most favorable to Plaintiff, was submitted with the
23   August 1 letter. (Doc. 44, Ex. 2 DEFT 2477). Plaintiff re-submitted the form and it was
24   stamped as received by Defendant on September 14, 2007. (Doc. 44, Ex. 2 DEFT 2470). On
25   September 19, 2007, five days after receiving another copy of Plaintiff's Incident Report
26   Form, Oesch contacted a colleague for legal advice, reminding him of her June 6, 2007 email
27   notification of Plaintiff's claim and forwarding him Plaintiff's Incident Report Form and his
28   medical reports. (Doc. 44, Ex. 2). In that letter, she noted her immediate concerns with the

1    claim, including that the date of loss was reported as May 2005, two years earlier, that, based

2    on the medical records, Plaintiff's symptoms may have begun before January 11, 2005, and

3    that the "disabling factor" did not appear to be an injury or accident.[6]

4            According to records submitted by Defendant, it then took Oesch another three

5    months, or until December 6, 2007, to discover that she did not have a signed authorization

6    form from Plaintiff, permitting her to obtain additional medical records. (Doc. 44. Ex. 10).

7    Defendant then appears to have spent a number of months gathering additional medical

8    records. (Doc. 44, Ex. 2, 10). At the end of August 2008, Plaintiff participated in an

9    examination under oath. (Doc. 44, Ex. 4). Several weeks later, Defendant requested that

10   Plaintiff sign additional authorizations for release of records. (Doc. 44, Ex. 10). On October

11   30, 2008, Defendant sent a letter to Arizona State University requesting Plaintiff's records.

12   (Doc. 50, Ex. 1, 11). On that same date, Defendant also sent Northwestern University a

13   general request for records. (Doc. 50, Ex. 11).[7] In February 2009, approximately 18 months

14   after Plaintiff filed his claim, White, Fleischner & Fino, the law firm hired by Defendant to

15   investigate Plaintiff's claim, requested that Plaintiff sign an additional authorization so that

16   ──────────────────

17           [6] In Defendant's Response, Defendant notes that from September-October, the
     underwriters would not have been involved because Oesch "would have been [] investigating
18   the circumstances of the claim, not the possibility of any misrepresentation." (Doc. 49).
     Although it may be true that Defendant did not involve any underwriters until much later in
19   the investigation, Defendant's own statements and evidence suggest that Oesch was
     immediately considering the possibility of misrepresentation and rescission. Oesch's Sept.
20   19, 2007 letter explains her "concerns", including that Plaintiff's symptoms began before
     January 2005. (Doc. 44, Ex. 2 DEFT 0178); *see also* Doc. 43 (stating that the "initial review
21   of Plaintiff's Incident Report Form and supporting documentation immediately revealed two
     threshold questions", including "should the Policy be rescinded due to Plaintiff's failure to
22   have disclosed his history of chronic tendonitis and right-knee pain in his application and
23   Letter of Health").

24

25           [7] It appears from the letters included in the record that these are Defendant's first
     requests for records from Arizona State University and Northwestern University. Each letter
26   requests the following general categories of records: athletic records; "medical records (he
     was on the football team and sustained injuries)"; physical therapy records; academic
27   records; financial and scholarship records; dates of attendance; and any internship records.
28   (Doc. 50, Ex. 11).

1    the firm may obtain records from Northwestern University. (Doc. 44, Ex. 2 DEFT 2708). In

2    March 2009, the firm requested that Dr. David Fleiss provide an expert opinion of Plaintiff's

3    medical records and condition. (Doc. 42, Ex. 26).  On April 9, 2009, Plaintiff filed this

4    lawsuit. (Doc. 2, Ex. 1).

5            Defendant claims that its investigation was reasonable, in part, because it took some

6    time to identify the doctors and trainers with whom Plaintiff consulted and to obtain the

7    relevant records from those individuals because Plaintiff failed to provide those documents

8    when he filed his claim. However, Defendant knew that Plaintiff was enrolled at

9    Northwestern University, and later Arizona State University, and that his claim was related

10   to his time as a college football player at these schools. And yet, a review of the records

11   submitted by Defendant suggests that Defendant did not contact either university until 13

12   months after Plaintiff filed his claim and was still seeking authorizations to obtain records

13   from Northwestern University in February 2009, 18 months later. Moreover, although

14   Defendant was aware in November 2007 that Plaintiff had consulted with Dr. Moussa, who

15   ordered an MRI of Plaintiff's knee around the time that Plaintiff submitted his insurance

16   application form, *see* Doc. 44, Defendant does not appear to have requested Plaintiff's

17   medical records from Dr. Moussa until October 30, 2008, more than a year after Plaintiff

18   filed his claim. (Doc. 44, Ex. 2 DEFT 0751; 50, Ex. 11).[8] Considering the evidence presented

19   by both parties, a reasonable jury could conclude that Defendant was unreasonable in

20   evaluating Plaintiff's claim, and given the significant delay, Defendant knew it was acting

21   unreasonably. *See Bjornstad*, 599 F. Supp.2d at 1174.

22           **IT IS THEREFORE ORDERED**:

23           1.      Plaintiff's Motion for Summary Judgment (Doc. 41) is **DENIED**;

24   _____

25           [8] In its Statement of Facts (Doc. 44), Defendant lists the additional documents
     requested by Oesch when she sent the November 2007 reservation of rights letter to Plaintiff.
26   It is clear from the documentation requests that Defendant was already aware that Plaintiff
     had consulted someone in Canada about his condition and that Dr. Moussa was treating
27   Plaintiff for his knee condition around the time he submitted his insurance application. (Doc.
28   44).

1        2.      Defendant's Motion for Summary Judgment (Doc. 43) is **DENIED**;

2        3.      Plaintiff's Motion to Strike and for Sanctions (Doc. 45) is **GRANTED IN**

3 **PART AND DENIED IN PART**.

4        DATED this 25th day of March, 2011.

G. Murray Snow
United States District Judge

- 21 -